Marshall, Ch. J.,
delivered the opinion of the court. — The Charming Betsy was an American built vessel, belonging to citizens of the United States, and sailed from Baltimore, under the name of the Jane, on the 10th of April 1800, with a cargo of flour for St. Bartholomew ; she was sent out for the purpose of being sold. The cargo was disposed of at St. Bartholomew; but finding it impossible to sell the vessel at that place, the master proceeded with her to the island of St. Thomas, where she was disposed of to Jared Shattuek, who changed her name to that of the Charming Betsy, *andhaving put on board her a cargo consisting of American produce, cleared her out, as a Danish vessel, for the island of Guadaloupe.
On her voyage, she was captured by a French privateer, and eight hands were put on board her for the purpose of taking her into Guadaloupe as a prize. She was afterwards re-captured by Captain Murray, commander of the Constellation frigate, and carried into Martinique. It appears, that the master of the Charming Betsy was willing to be taken into that island; but when there, he claimed to have his vessel and cargo restored, as being the property of Jared Shattuek, a Danish burgher.
Jared Shattuek was born in the United States, but had removed to the island of St. Thomas, while an infant, and was proved to have resided there ever since the year 1789 or 1790. He had been accustomed to carry on trade as a Danish subject; had married a wife and acquired real *66 property in the island, and also taken the oath of allegiance to the crown of Denmark in 1797.
Considering him as an American citizen, who was violating the law prohibiting all intercourse between the United States and France, or its dependencies, or the sale of the vessel as a mere cover to evade that law, Captain Murray sold the cargo of the Charming Betsy, which consisted of American produce, in Martinique, and brought the vessel into the port of Philadelphia, where she was libelled under what is termed the non-intercourse law. The vessel and cargo were claimed by the consul of Denmark as being the bond fide property of a Danish subject.
This cause came on to be heard before the judge for the district of Pennsylvania, who declared the seizure to be illegal, and that the vessel ought to be restored, and the proceeds of the cargo paid to the claimant, or his lawful agent, together with costs and such damages as should be assessed by the clerk of the court, who was directed to inquire into and report the amount thereof; for which purpose, he was also directed to associate with himself two intelligent merchants of the district, and duly inquina what damage Jared Shattuck had sustained by reason of the premises. If they should be of opinion that the *officers and crew of the Constellation had conferred any benefit on the owners of the Charming Betsy, by z-escuing her out of the hands of the French captoz’s, they were, in the adjustment, to allow reasonable compensation for the service.
In pursuance of this order, the clerk associated with himself two merchants, and reported that having exmained the proofs and vouchers exhibited in the cause, they were of opinion, that the owner of the vessel and cargo had sustained damage to the amount of $20,594.16, from which is to be deducted the sum of $4363.86, the amount of moneys paid into court arising from the sales of the cargo, and the further sum of $1300, being the residue of the proceeds of the said sales remaining, to be brought into court, $5663.86. This estimate is exclusive of the value of the vessel, which was fixed at $3000. To this report, an account is annexed, in which the damages, without particularizing the items on which the estimate was formed, were stated at $14,930.30.
No exceptions having been taken to this report, it was confirmed, and, by the final sentence of the court, Captain Murray was ordered to pay the amount thereof. From this decree, an appeal was prayed to the circuit court, where the decree was affirmed so far as it directed restitution of the vessel, and payment to the claimant of the net proceeds of the sale of the cai’go in Martinique, and reversed for the residue. From this decree, each party has appealed to this court.
It is contended on the part of the captors, in substance, 1st. That the vessel Charming Betsy and cargo are confiscable under the laws of the United States. If zrot so, 2d. That the captors are entitled to salvage. If this is against them, 3d. That they ought to be excused from damages, ^because there was probable cause for seizing the vessel and bringing her into port.
1. Is the Charming Betsy subject to seizure and condemnation for having violated a law of the United States ? The libel claims this forfeiture, under the act passed in February 1800, further to suspend the commercial intercourse between the United States and France and the dependencies *67 thereof. That act declares, “ that all commercial intercourse,” &c. It has been very properly observed, in argument, that the building of vessels in the United States for sale to neutrals, in the islands, is, during war, a profitable business, which congress cannot be intended to have prohibited, unless that intent be manifested by express words, or a very plain and necessary implication. It has also been observed, that an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains, and consequently, can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country. These principles are believed to be correct, and they ought to be kept in view, in construing the act now under consideration.
The first sentence of the act which describes the persons whose commercial intercourse with France, or her dependencies, is to be prohibited, names any person or persons resident within the United States, or under their protection. Commerce carried on by persons within this description is declared to be illicit. From persons the act proceeds to things, and declares explicitly the cases in which the vessels employed in this illicit commerce shall be forfeited. Any vessel owned, hired or employed, wholly or in part, by any person residing within the United States, or by any citizen thereof, residing elsewhere, which shall perform certain *acts recited in the law, becomes liable to forfeiture. It seems to the court, to be a correct construction of these words, to say, that the vessel must be of this description, not at the time of the passage of the law, but at the time when the act of forfeiture shall be committed.
The cases of forfeiture are, 1st. A vessel of the description mentioned, which shall be voluntarily carried, or shall be destined, or permitted to proceed to any port within the French republic. She must, when carried, or destined, or permitted to proceed to such port, be a vessel within the description of the act. The second class of cases are those where vessels shall be sold, bartered, intrusted or transferred, for the purpose that they may proceed to such port or place. This part of the section makes the crime of the sale dependent on the purpose for which it was made. If it was intended, that any American vessel, sold to a neutral, should, in the possession of that neutral, be liable to the commercial disabilities imposed on her while she belonged to citizens of the United States, such extraordinary intent ought to have been plainly expressed ; and if it was designed to prohibit the sale of American vessels to neutrals, the words placing the forfeiture on the intent with which the sale was made ought not to have been inserted. The third class of cases are those vessels which shall be employed in any traffic by or for any person resident within the territories of the French republic, or any of its dependencies. In these cases, too, the vessels must be within the description of the act, at the time the fact producing the forfeiture was committed.
The Jane having been completely transferred, in the island of St. Thomas, by a bond fide sale, to Jared Shattuck, and the forfeiture alleged to have accrued on a fact subsequent to that transfer, the liability of the vessel forfeiture must depend on the inquiry, whether the purchaser was the description of the act.
Jared Shattuck having been born within the United ^States, *68 not being proved to have expatriated himself, according to any form prescribed by law, is said to remain a citizen, entitled to the benefit, and subject to the disabilities, imposed upon American citizens; and therefore, to come expressly within the description of the act which comprehends American citizens residing elsewhere.
Whether a person bom within the United States, or becoming a citizen according to the established laws of the country, can divest himself absolutely of that character, otherwise than in such manner as maybe prescribed by law, is a question which it is not necessary at present to decide. The cases cited at bar, and the arguments drawn from the general conduct of the United States on this interesting subject, seem completely to establish the principle, that an American citizen may acquire, in a foreign country, the commercial privileges attached to his domicil, and be exempted from the-operation of an act expressed in such general terms as that now under consideration. Indeed, the very expressions of the act Avould seem to exclude a person under the circumstances of Jared Shattuck. He is not a person under the protection of the United States. The American citizen who goes into a foreign country, although he owes local and temporary allegiance to that country, is yet, if he performs no other act changing his condition, entitled to the protection of his OAvn government; and if, without the violation of any municipal law, he should be oppressed unjustly, he would have a right to claim that protection, and the interposition of the American government in his favor, would be considered as a justifiable interposition. But his situation is completely changed, where, by his own act, he has made-himself the subject of a foreign power. Although this act may not be-sufficient to rescue him from punishment for any crime committed against the United States, a point not intended to be decided, yet it certainly places him out of the protection of the United States, while Avithin the territory of the sovereign to whom he has sworn allegiance, and consequently, takes him out of the description of the act.
It is, therefore, the opinion of the court, that the ^Charming Betsy, with her cargo, being at the time of her re-capture the bond fide property of a Danish burgher, is not forfeitable, in consequence of her being employed in carrying on trade and commerce with a French island.
2. The vessel not being liable to confiscation, the court is brought to the-second question, which is — Are the re-captors entitled to salvage ?
In the case of The Amelia (1 Cr. 1), it was decided, on mature consideration, that a neutral armed vessel, in possession of the French, might, in the then existing state of hostilities between the two nations, be laAvfully captured; and if there were'well-founded reasons for the opinion, that she was in, imminent hazard of being condemned as a prize, the re-captors would be entitled to salvage. The court is well satisfied with the decision given in that case, and considers it as a precedent not to be departed from in other cases-attended with circumstances substantially similar to those of the Amelia. One of these circumstances is, that the vessel should be in a condition to American commerce.
degree of arming which should bring a vessel Avithin this descripnot been ascertained, and perhaps, it would be difficult precisely to hmits, the passing of which would bring a captured vessel within of the acts of congress on this subject. But although there- *69 may be difficulty in some cases, there appears to be none in this. According to the testimony of the case, there was on board but one musket, a few ounces of powder and a few balls. The testimony respecting the cutlasses is not considered, as showing that they were in the vessel at the time of her re-capture. The capacity of this vessel for offence appears not sufficient to warrant the capture of her as an armed vessel. Neither is it proved to the satisfaction of the court, that the Charming Betsy was in such imminent hazard of being condemned, as to entitle the re-captors to salvage.
*It remains to inquire, whether there was in this case such probable cause for sending in the Charming Betsy for adjudication, as will justify Captain Murray for having broken up her voyage, and excuse him from the damages sustained thereby. To effect this, there must have been substantial reason for believing her to have been at the time, wholly or in part, an American vessel, within the description of the act; or hired or employed by Americans ; or sold, bartered or trusted for the purpose of carrying on trade to some port or place belonging to the French republic.
The circumstances relied upon are, principally, 1st. The prods verbal of the French captors. 2d. That she was an American built vessel. 3d. That the sale was recent. 4th. That the master was a Scotchman, and the muster-roll showed that the crew were not Danes. 5th. The general practice in the Danish islands of covering neutral property.
The proofs verbal contains an assertion that the mate declared that he was an American, and that their flag had been American, and had been changed, during the cruise, to Danish, which declaration was confirmed by several of the crew. If the mate had really been an American, the vessel would not, on that account, have been liable to forfeiture, nor would that fact have furnished any conclusive testimony of the character of the vessel. The proems verbal, however, ought for several reasons to have been suspected. The general conduct of the French West India cruisers, and the very circumstance of declaring that the Danish colors were made during the chase, were sufficient to destroy the credibility of the proems verbal. Captain Murray ought not to have believed that an American vessel, trading to a French port, in the assumed character of a Danish bottom, would have been without Danish colors.
*That she was an American vessel, and that the sale was recent, cannot be admitted to furnish just cause of suspicion, unless the sale of American built vessels had been an illegal or an unusual act. That the master was a Scotchman, and that the names of the crew were not generally Danish, are circumstances of small import, when it is recollected, that a very great proportion of the inhabitants of St. Thomas are British and Americans. The practice of covering American property in the islands might and would justify Captain Murray in giving to other causes of suspicion more weight than they would otherwise be entitled to, but cannot be itself a motive for seizure. If it was, no neutral vessel could escape, for this ground of suspicion would be applicable to them all.
These causes of suspicion, taken together, ought not to have been deemed sufficient to counterbalance the evidences of fairness with which they were opposed. The ship’s papers appear to have been perfectly correct, and the information of the master, uncontradicted by those belonging to the vessel who were taken with him, corroborated their verity. No circumstance ex *70 isted which ought to have discredited them. That a certified copy of Shat-tuck’s oath, as a Danish subject, was not on board, is immaterial, because, being apparently on all the papers a burgher, and it being unknown that he was born in the United States, the question, whether he had ceased to be a citizen of the United States, could not present itself.
Nor was it material, that the power given by the owners of the vessel to their master to sell her in the West Indies, was not exhibited. It certainly ■ was not necessary, to exhibit the instructions under which the vessel was acquired, when the fact of acquisition was fully proved by the documents on board, and by other testimony.
Although, there does not appear to have been such cause to suspect the Charming Betsy and her cargo to have been American, as would justify Captain Murray in bringing her in for adjudication, yet many other circumstances combine with the fairness of his character, to ^produce a conviction, that he acted upon correct motives, from a sense of duty; for which reason this hard case ought not to be rendered still more so, by a decision in any respect oppressive.
His orders were such as might well have induced him to consider this as an armed vessel within the law, sailing under authority from the French republic; and such too as might well have induced him to trust to very light suspicions respecting the real character of a vessel, appearing to belong to one of the neutral islands. A public officer, intrusted on the high seas to perform a duty deemed necessary by his country, and executing according to the best of his judgment the orders he has received, if he is a victim oí any mistake he commits, ought certainly never to be assessed with vindictive or speculative damages. It is not only the duty of the court to relieve him from such, when they plainly appear to have been imposed on him, but no sentence against him ought to be affirmed, where, from the nature of the proceedings, the whole case appears upon the record, unless those proceedings are such as to show on what the decree has been founded, and to support that decree.
In the case at bar, damages are assessed as they would be by the verdict of the jury, without any specification of items, which can show how the account was made up, or on what principles the sum given as damages was assessed. This mode of proceeding would not be approved of, if it was even probable, from the testimony contained in the record, that the sum reported by the commissioners of the district court was really the sum due. The district court ought not to have been satisfied with a report, giving a gross sum in damages, unaccompanied by any explanation of the principles on which that sum was given. It is true, Captain Murray ought to have excepted to this report. His not having done so, however, does not cure an error apparent upon it, and the omission to show how the damages which were given had accrued, so as to enable the judge to decide on the propriety of the- assessment of his commissioners, is such an error.
Although the court would in any case disapprove of this mode of proceeding, yet, in order to save the parties the cost of further prosecuting thisbusiness in the circuit *court, the error which has been stated might have been passed over, had it not appeared probable, that the sum, for which the decree of the district court was rendered, is really greater than it *71 ought to have been, according to the principles by which the claim should be adjusted.
This court, therefore, is not satisfied with either the decree of the district or circuit court, and has directed me to report the following decree:
Decree of the Court.
— This cause came on to be heard, on the transcript of the record of the circuit court, and was argued by counsel; on consideration whereof, it is adjudged, oz-dered and decz-eed as follows, to wit: That the decree of the circuit court, so far as it affirms the decree of the district court, which directed restitution of the vessel, and payment to the claimant of the net proceeds of the sale of the cargo in Martinique, deducting the costs and charges there, accoz-ding to amount exhibited by Captain Murray’s agent, being one of the exhibits in the cause, and so far as it directs the paz-ties to bear their own costs, be affirmed; and that the residue of the said decree, whereby the claim of the owner to damages for the seizure and detention of his vessel was rejected, be reversed.
And the court, proceeding to give such further decree as the circuit court ought to have given, doth fzzz-ther adjudge, order and decree, that so much of the decree of the district court as adjudges the libellant to pay costs and damages, be affirmed; but that the residue thez-eof, by which the said damages are estimated at $20,594.16, and by which the libellant was directed to pay that sum, be reversed and annulled. And this court does further order and decree, that the cause be remanded to the circuit couz-t, with directions to refer it to commissionez-s, to ascertain the damages sustained by the claimants, in consequence of the refusal of the libellant to restore the vessel and cargo at Martinique, and in consequence of his sending her into a port of the United States for adjudication; and that the said commissioners be instructed to take the actual prime cost of the caz-go and vessel, with interest thereon, including *the insurance actually paid, and such expenses as were necessarily sustained in consequence of bringing the vessel into the United States, as the standard by which the damages ought, to be measured. Each party to pay his own costs in this court, and in the circuit court. All which is ordered and decreed accordingly. (a)

 Captain Murray was reimbursed his damages, interest and charges, out of the treasury of the United States, by an act of congress, January 31st, 1805. (6 U. S. Stat. 56.)