CROSS–SOUND FERRY SERVICES, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents,

and

Viking Starship, Inc., Intervenor.

No. 90–1053.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 28, 1990.

Decided May 10, 1991.

Eugene D. Gulland, for petitioner.

Craig M. Keats, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, Henri F. Rush, Deputy Gen. Counsel and Evelyn G. Kitay, Atty., I.C.C., and James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan and David Seidman, Attys., Dept. of Justice, were on the brief, for respondents.

Edward D. Greenberg and Mark T. Priesing were on the brief, for intervenor.

Before MIKVA, Chief Judge, WILLIAMS and THOMAS, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

Opinion concurring in part and concurring in the denial of the petition for review filed by Circuit Judge CLARENCE THOMAS.

MIKVA, Chief Judge:

In this case, we revisit the propriety of the Interstate Commerce Commission's ("ICC" or the "Commission") finding that certain water carrier services provided by intervenor Viking Starship, Inc. ("Viking") are ferry services exempt from ICC regulation. In *Cross–Sound Ferry Servs., Inc. v. ICC*, 873 F.2d 395 (D.C.Cir.1989) [hereinafter *Cross–Sound I* ], we remanded for further clarification of the Commission's views as to the scope of the ferry exemption. After reviewing the Commission's decision on remand, *Viking Starship, Inc., Common Carrier Application*, 6 I.C.C.2d 228 (1989) [hereinafter *Viking II* ], and the contentions of petitioner Cross–Sound Ferry Services, Inc. ("Cross–Sound"), we conclude that the Commission has not changed its policy with respect to the ferry exemption. Accordingly, we uphold the Commission's finding that Viking is an exempt ferry service, and reject Cross–Sound's pro-

cedural challenges to the Commission's decisionmaking process. In addition, we find that the Commission's decision did not trigger environmental review responsibilities under the National Environmental Policy Act or the Coastal Zone Management Act.

## I.

In 1988, the Commission granted Viking temporary authority to transport passengers over two routes in Long Island Sound: (1) Montauk, New York to Groton/New London, Connecticut, and 2) Montauk to Block Island, Rhode Island. *See Cross–Sound I*, 873 F.2d at 396 (describing statutory basis for temporary authorizations). Relying on a provision of the Interstate Commerce Act that declares transportation provided "by a ferry" to be exempt from the Commission's jurisdiction, *see* 49 U.S.C. § 10544(a)(4) (1988), Viking subsequently asked the Commission to dismiss its application for a permanent license on the ground that its operations are exempt ferry services. Cross–Sound, which transports passengers, automobiles, and freight between Orient Point, New York and New London, challenged Viking's claim, but, as detailed in *Cross–Sound I*, 873 F.2d at 396–400, the Commission agreed with Viking that its operations are exempt. *See Viking Starship, Inc.—Common Carrier Application*, 4 I.C.C.2d 634 (1988) [hereinafter *Viking I*].

Reviewing *Viking I*, we acknowledged the Commission's "great latitude in determining the scope of the ferry exemption," *Cross–Sound I*, 873 F.2d at 398, but found ourselves unable to discern the Commission's interpretation. *Id.* at 400. We noted several ICC decisions asserting jurisdiction over apparently similar Long Island Sound routes, and suggested that the discrepancy between those cases and the Viking decision were *"prima facie* evidence of a change in ICC policy." *Id.* at 399. In addition, we expressed uncertainty about the significance of various factors the Commission uses to determine whether the ferry exemption applies, such as the length and directness of a carrier's route and the frequency of service. *Id.* at 399–400. Giv-

en these perceived ambiguities, we remanded "for a fuller exegesis of the Commission's views." *Id.* at 396.

Although it acknowledged on remand that prior decisions may have misconstrued the significance of certain factors flagged by the court in *Cross–Sound I, see Viking II*, 6 I.C.C.2d at 237 (referring to role of absolute distance), the Commission denied changing its view of the ferry exemption, *id.* at 233 n. 8. It distinguished the Long Island Sound cases we cited in our panel opinion, *id.*, and explained in greater detail the factors it uses to determine what constitutes a ferry, *id.* at 235–40. After discussing the general contours of the ferry exemption, the Commission specifically reaffirmed its earlier finding that Viking's services qualify as exempt ferriage under section 10544(a)(4). *Id.* at 241–46. In addition, the Commission rejected Cross–Sound's claim that a decision exempting Viking from the Commission's jurisdiction nonetheless obligated the ICC to comply with environmental review procedures under the National Environmental Policy Act and the Coastal Zone Management Act. *Id.* at 246–49.

## II.

■ In order to determine whether the Commission has complied with our mandate in *Cross–Sound I*, we must evaluate the sufficiency of the Commission's explanations in *Viking II* as to the scope of the ferry exemption. If we find that the ICC's current view of the ferry exemption "diverge[s] from agency precedent," then, in order to uphold the new interpretation, we must also find that the Commission "suppl[ied] a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *See Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C.Cir.1989) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L:Ed.2d 701 (1971)); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983). If, on the other hand, we deter-

mine that the Commission "has not in fact diverged from past decisions, [then] the need for a comprehensive and explicit statement of its current rationale is less pressing." *Hall,* 864 F.2d at 872. The agency's explanation in such a case "need not be elaborate"; we will uphold its findings, "though of less than ideal clarity, if the agency's path may reasonably be discerned." *Id.* at 872–73 (quoting *Greater Boston Television,* 444 F.2d at 851).

■ Petitioner contends that our opinion in *Cross–Sound I* conclusively determined that the agency had changed its policy with respect to the ferry exemption. We decline, however, to adopt so narrow a view of our earlier holding. We remanded the Commission's decision in *Viking I* precisely because we were unsure what its interpretation of the ferry exemption *was, see Cross–Sound I,* 873 F.2d at 400; it would be inappropriate to let our earlier expressions of puzzlement prevent a subsequent panel from evaluating the Commission's newly tendered explanations *de novo.* Reviewing the *Viking II* decision, we conclude that the Commission has not diverged from prior precedent.

First, we believe that the Commission persuasively distinguished those cases where it has exercised jurisdiction over water carriers operating in Long Island Sound. As the Commission explained in *Viking II,* 6 I.C.C.2d at 233 n. 8, three of the examples that we cited in *Cross–Sound I* as *"prima facie* evidence of a change in ICC policy," 873 F.2d at 398–99, involved the transportation not only of passengers but also of freight, a subject area over which the Commission has long exercised jurisdiction. *See Mascony Transport and Ferry Servs., Inc.,* 353 I.C.C. 60, 61 (1976), *petition for review denied sub nom Cross–Sound Ferry Servs., Inc. v. U.S.,* 573 F.2d 725 (2d Cir.1978) (applicant sought to transport "general commodities and passengers" between New London and Greenport, New York); *Cross–Sound Ferry Servs., Inc.—Extension,* ICC Docket No. W–1290 (Sept. 23, 1983) (applicant sought to transport "passengers, general commodities, automobiles with passengers, and

tractors, trailers, and trucks" between New London and Montauk); and *B.I. Marine Express, Inc.,* ICC Docket No. W–1450 (Oct. 14, 1986) (applicant proposed to transport "both passengers and general freight" between Westerly, Rhode Island and Block Island).

Indeed, the Commission has repeatedly held that "the word ferry does not generally include the transportation of goods and merchandise," *McAllister Bros., Inc.—Investigation of Control,* 336 I.C.C. 590, 592–93 (1970), and has refused to exempt freight carriers from regulation simply because the passenger aspect of their operation, viewed in isolation, might qualify as a "ferry." *Id.* at 593–94 (finding that carrier authorized to transport passengers and general commodities between Bridgeport, Connecticut and Port Jefferson, New York was not an exempt ferry, even though carrier had apparently never exercised its freight authority). *See also B.I. Marine Express,* ICC Docket No. W–1450 (*"ferry* service ... entails the transportation of passengers, their automobiles, and accompanying baggage, but does not involve the transportation of general freight"); *Ann Arbor R.R. Co. Common Carrier Application,* 250 I.C.C. 490, 491 (1942). The Supreme Court has interpreted the term "ferry" as excluding freight services, *see St. Clair County v. Interstate Sand and Car Transfer Co.,* 192 U.S. 454, 467, 24 S.Ct. 300, 304, 48 L.Ed. 518 (1904) (noting that "the ferry business is confined to the transportation of persons with or without their property"), as have various federal regulations. *See, e.g.,* 46 CFR § 171.010(d)(2) (1990) (Coast Guard safety regulations); 49 CFR § 171.8 (1989) (hazardous materials transportation).

Although its efforts to distinguish the fourth example of Long Island Sound water carrier regulation that we cited in *Cross–Sound I* are less persuasive, the Commission's view that *Shoreline Boating Serv., Inc.,* ICC Docket No. W–1294 (served May 29, 1984), involved excursion operations (i.e., round-trip service only) instead of point-to-point passenger service can be supported. *See Viking II,* 6 I.C.C.2d at 233 n. 8 (noting that excursion

operations, like freight services, have "historically been regulated"). The administrative law judge reviewing Shoreline's original request for operating authority discussed the excursion character of the proposed services in some detail. *See Shoreline Boating Serv., Inc., Common Carrier Application,* ICC Docket No. W–1294 (August 19, 1976) (noting that carrier sold "round-trip transportation tickets alone"; describing public support for the excursion operations; and discussing excursion services offered by carriers contesting Shoreline's request for operating authority).

We also note that the Commission's decision in *Viking II* is consistent with at least one other decision finding water carrier services on Long Island Sound to be exempt ferriage. In *North Rip Fish Harvest, Ltd.,* ICC Docket No. W–1325 (May 13, 1980), the Commission held that passenger service between Montauk and Block Island—one of Viking's proposed routes—was exempt from regulation under section 10544(a)(4). *See also Michigan–Wisconsin Transp. Co.,* ICC Docket No. W–1377 (May 15, 1984) (carrier operating across Lake Michigan is exempt under section 10544(a)(4)).

Finally, we reject Cross–Sound's suggestion that the Commission's treatment of distance in *Viking II* rises to the level of a change in agency policy. *See* 6 I.C.C.2d at 237–40 (noting that earlier cases may have "overstated" the role of absolute distance). In *Cross–Sound I,* we criticized the Commission for failing to explain the significance it attached to the length of a carrier's route. *See* 873 F.2d at 399. *Viking II* suggests that the Commission, consistent with its decision in *Michigan–Wisconsin Transp. Co.,* ICC Docket No. W–1377, views distance as a relevant but not dispositive factor in determining whether a particular service qualifies as a "ferry." That is, so long as the carrier possesses the usual attributes of a ferry—such as significant time or distance savings compared to overland routes—the absolute length of the route will not prevent the carrier from qualifying as a ferry. *See Viking II,* 6 I.C.C.2d at 240.

This approach is consistent with prior Commission decisions that seemed to establish per se limits on the distances a ferry could travel. As the Commission explained, those decisions also involved services not regularly associated with ferries. *See Viking II,* 6 I.C.C.2d at 239–40; *Pere Marquette Ry. Co.,* 260 I.C.C. 206 (1944) (carrier transporting not only passengers but also railroad cars and newly manufactured automobiles across Lake Michigan); *Ann Arbor R.R. Co. Common Carrier Application,* 250 I.C.C. 490 (1942) (carrier transporting freight cars, in addition to passengers, across Lake Michigan); *Canadian Pacific Ry. Co. v. U.S.,* 73 F.2d 831, 834–35 (9th Cir.1934) (discussing excursion character and luxurious nature of service across Puget Sound). Moreover, the distances at issue in this case—between 15 and 30 miles, depending on the particular route, *see Cross–Sound I,* 873 F.2d at 397—are well within the 60–145 mile upper boundaries even those earlier cases established for ferry service.

Thus, we conclude that the Commission did not diverge from prior precedent or policy in evaluating Viking's services. Accordingly, there was no need for the Commission to justify a change in policy. Given the Commission's comprehensive discussion of the ferry exemption, which responded specifically to this court's concerns about apparently inconsistent precedents and the relative importance of the various criteria used to evaluate ferries, we have no difficulty discerning the agency's path and conclude that it satisfied the standards for reasoned decisionmaking.

### III.

■ Having concluded that the Commission did not impermissibly alter its view of the ferry exemption, we may set aside the Commission's decision applying the exemption to Viking only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). *See Railway Labor Execs. Ass'n v. ICC,* 914 F.2d 276, 280 (D.C. Cir.1990).

■ Under section 10544(a)(4), ferries are exempt from regulation "[e]xcept to the extent the Interstate Commerce Commission finds it necessary to exercise jurisdiction to carry out" the national transportation policy. *See* 49 U.S.C. § 10101 (1988) (describing national transportation policy). Applying the principles it enunciated earlier in its decision, the Commission reasonably determined that Viking's Montauk–Block Island and Montauk–Groton/New London operations qualify as exempt ferries. *See Viking II*, 6 I.C.C.2d at 241–42 (noting the "frequent and regular" character of the service; its "modest," "no-frills" quality; the absence of any "freight service whatsoever" or "detours for sightseeing purposes or for intermediate stops"; and the services' ability to "substitute[ ], with a substantial reduction in overall mileage, for a road and bridge connecting nearby points in neighboring states").

We can find no error in the Commission's further determination that the national transportation policy does not require regulation of Viking's services in order to protect Cross–Sound against potential diversion or "cream-skimming" of its customer base. *See* 49 U.S.C. § 10101(a)(1)(C) (national transportation policy includes encouraging "sound economic conditions among carriers"); *Viking II*, 6 I.C.C.2d at 242–46. The Commission found that the services of the two carriers differed; that even with respect to shared services—i.e., passengers without vehicles—the distance between Orient Point, New York and Montauk, New York (75 "congested" highway miles) limited actual competition; and that, in any case, there was "sufficient traffic in the area to accommodate Viking's small-scale operation without driving Cross–Sound out of business." *Viking II*, 6 I.C.C.2d at 243–44.

■ Cross–Sound contends that the Commission ignored evidence that Viking actually offers excursion and freight services inconsistent with the ferry exemption. As the Commission concedes, however, Cross–Sound may pursue these alleged violations through a properly framed request for enforcement. *See Viking II*, 6 I.C.C.2d

at 230 n. 3; 49 CFR Part 1111 (1990) (procedures for filing complaints with the Commission).

■ Finally, we reject Cross–Sound's claims that the Commission erred in failing to hold further hearings regarding Viking's services, or in denying the company's discovery requests. Although we suggested in *Cross–Sound I* that the Commission might "find it useful on remand to use a hearing as a vehicle to re-examine and articulate its new view of the ferry exemption," 873 F.2d at 401, that advice was premised on our assumption that the Commission would be altering its traditional ferry policy. Given the agency's "broad discretion in deciding whether to grant a hearing," *see, e.g., Cities of Carlisle and Neola, Iowa v. FERC*, 741 F.2d 429, 431 (D.C.Cir.1984), and its view (which we uphold here) that the *Viking* decisions do not constitute a change in policy, the Commission reasonably concluded that hearings would not be "productive" and that "additional 'evidence' would not be particularly helpful in addressing the legal issues that predominate in this case." *Viking II*, 6 I.C.C.2d at 233.

As to Cross–Sound's discovery claims, we note this circuit's position that "the conduct and extent of discovery in agency proceedings is a matter ordinarily entrusted to the expert agency in the first instance and will not, barring the most extraordinary circumstances, warrant the Draconian sanction of overturning a reasoned agency decision." *See Trailways Lines, Inc. v. ICC*, 766 F.2d 1537, 1546 (D.C.Cir.1985). No such extraordinary circumstances exist to warrant overturning the Commission's denial of Cross–Sound's discovery requests.

## IV.

Having approved on both substantive and procedural grounds the Commission's finding that Viking's services are exempt from regulation under section 10544(a)(4), we next address Cross–Sound's contention that the Commission violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. (1988), and the Coastal Zone Management Act ("CZMA"), 16

U.S.C. §§ 1451–1464 (1988), by failing to conduct any environmental review of Viking's services.

■ As an initial matter, the Commission contends that Cross–Sound lacks standing to challenge its actions under either NEPA or CZMA. Standing constitutes a threshold jurisdictional inquiry. But this court has held that "when the merits of a case are clearly against the party seeking to invoke the court's jurisdiction, the jurisdictional question is especially difficult and far-reaching, and the inadequacies in the record or briefing make the case a poor vehicle for deciding the jurisdictional question, we may rule on the merits without reaching" the jurisdictional contention. *Adams v. Vance,* 570 F.2d 950, 954 n. 7 (D.C.Cir.1978); *accord Chinese Am. Civic Council v. Attorney General,* 566 F.2d 321, 325 (D.C.Cir.1977). *See Secretary of the Navy v. Avrech,* 418 U.S. 676, 678, 94 S.Ct. 3039, 3040, 41 L.Ed.2d 1033 (1974) (per curiam) (assuming that district court had jurisdiction and resolving case on the merits, noting that "even the most diligent and zealous advocate could find his ardor somewhat dampened in arguing a jurisdictional issue where the decision on the merits is thus foreordained"); *Norton v. Mathews,* 427 U.S. 524, 530–532, 96 S.Ct. 2771, 2774–2776, 49 L.Ed.2d 672 (1976) (finding it "unnecessary" to resolve "difficult and perhaps close jurisdictional arguments" where a prior Supreme Court decision dictated resolution of the merits against the party asserting jurisdiction). *See also United States v. Augenblick,* 393 U.S. 348, 351–52, 89 S.Ct. 528, 531–32, 21 L.Ed.2d 537 (1969); *Southeastern Community College v. Davis,* 442 U.S. 397, 404 n. 5, 99 S.Ct. 2361, 2366 n. 5, 60 L.Ed.2d 980 (1979). We believe that this is a rare case in which we should exercise our discretion to proceed directly to the merits.

First, as discussed more fully below, the merits of Cross–Sound's environmental contentions can be resolved easily, particularly in light of our earlier finding that the Commission has not altered its policy with respect to the ferry exemption. Second, the question of Cross–Sound's standing is quite complex, involving inquiries into difficult issues such as the prudential standing of competitors, *see, e.g., Hazardous Waste Treatment Council v. EPA,* 861 F.2d 277, 282–85 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989); landowner injury, *see, e.g., Goos v. ICC,* 911 F.2d 1283, 1289–91 (8th Cir.1990); and the Commission's statutory authority to consider environmental factors under the national transportation policy of 49 U.S.C. § 10101 in determining whether to override the ferry exemption. As to the last question, which goes to the redressability of Cross–Sound's asserted injuries, we have serious doubts concerning the narrow construction of section 10101 urged by our concurring colleague. *See* Concurring Opinion at 337–338. Although this court must defer to an agency's reasonable interpretation of a statute that Congress has entrusted it to administer, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), the Commission has not definitively construed section 10101 as precluding consideration of environmental factors, notwithstanding the cursory footnote on which our colleague relies. *See Viking II,* 6 I.C.C.2d at 249 n. 33; Concurring Opinion at 337. Whether Congress intended the agency's inquiry under section 10101 to encompass environmental considerations is an intricate question we need not answer on the undeveloped record before us. We note only that the term "efficient," which is used in section 10101(a)(1)(B)'s directive that the Commission promote "efficient transportation," has classically been thought to incorporate the full range of possible externalities, including environmental costs and benefits.

Finally, the administrative record and the briefs in this case provide insufficient factual documentation to verify or disprove Cross–Sound's environmental standing claims. *See Avrech,* 418 U.S. at 677–78, 94 S.Ct. at 3039–40 (expressing unwillingness to decide jurisdictional question without further argument, even after ordering supplemental briefing). Our concurring colleague's view that Cross–Sound's asserted injuries could not be redressed by the Com-

mission, as to which we have serious qualms, allows him to avoid confronting knotty factual questions concerning Cross-Sound's injuries, *see* Concurring Opinion at 336, questions that would ultimately require a remand to the Commission for further findings. Under these circumstances, we deem it appropriate to review the merits of Cross-Sound's environmental claims directly, to which we now turn.

## A. NEPA

■ Section 102(2)(C) of NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for every "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In *Viking II,* the Commission found that a "decision simply holding that an operation is a ferry and declining to take the affirmative step necessary to assert jurisdiction is not the type of action that triggers" NEPA review. 6 I.C.C.2d at 248. Cross-Sound disputes this interpretation, arguing that the Commission's change in policy with respect to section 10544(a)(4) constitutes a major federal action under NEPA.

Our conclusion that the Commission did *not* change its policy with respect to the ferry exemption might well dispose of Cross-Sound's claim. Indeed, petitioner's counsel effectively conceded at oral argument that success on the policy change question was a prerequisite to success on the NEPA claim. In any case, the only "action" the Commission even conceivably took was in finding that Viking's services are statutorily exempt. We believe that *Defenders of Wildlife v. Andrus,* 627 F.2d 1238 (D.C.Cir.1980), in which this court held that the Secretary of the Interior's failure to prevent the state of Alaska from carrying out a wolf kill program on federal lands did not constitute a major federal action, is controlling. There, we held that an agency must undertake some "overt act" to trigger NEPA's requirements; the agency's mere refusal to exercise its statutory authority to act would not suffice. *Id.* at 1245–46.

Unlike an ordinary licensing decision, in which the Commission affirmatively determines that a water carrier's proposed services are required by the "public convenience and necessity" under 49 U.S.C. § 10922, the Commission here simply applied the statutory ferry exemption of section 10544(a)(4) and declined to assert jurisdiction to advance the national transportation policy of section 10101, thereby placing the case squarely within the "inaction" rubric of *Defenders of Wildlife. See Viking II,* 6 I.C.C.2d at 247 (noting that section 10544(a)(4) "itself exempts ferry services from our jurisdiction, and all that the agency did was to take a look at whether Viking was conducting exempt services"). Common sense supports our conclusion that the Commission's decision does not constitute a major federal action; as we said in *Defenders of Wildlife,* "[n]o agency could meet its NEPA obligations if it had to prepare an environmental impact statement every time the agency had power to act but did not do so." 627 F.2d at 1246.

## B. CZMA

■ The Coastal Zone Management Act seeks to protect the land and water resources of the nation's coastal zone through a cooperative governmental effort in which states are given primary responsibility for developing coastal resource management programs. *See, e.g.,* 16 U.S.C. § 1451(i) (congressional findings); 16 U.S.C. § 1452(2) (congressional declaration of policy). Section 307(c)(1) of CZMA requires federal agencies "conducting or supporting activities directly affecting the coastal zone" to comply with the affected states' management programs "to the maximum extent practicable." 16 U.S.C. § 1456(c)(1). An implementing regulation requires federal agencies to provide the affected states with so called "consistency determinations" for proposed activities at least ninety days prior to final federal approval. *See* 15 CFR § 930.34(a), (b) (1990). Cross-Sound contends that the Commission violated these provisions by failing to notify the relevant states prior to deeming Viking exempt from its jurisdiction under section 10544(a)(4). We reject this claim.

CZMA and the implementing regulations on which Cross–Sound relies expressly *exclude* federal licensing or permitting activities from the definition of a "federal activity," *see* 15 CFR § 930.31(c); instead, a separate procedural scheme places primary compliance responsibilities for such matters on the applicant and the affected states, not the federal agency. *See* 16 U.S.C. § 1456(c)(3)(A) ("any applicant for a required Federal license or permit to conduct an activity affecting land or water uses in the coastal zone" of a state must certify to the federal agency that its activity will comply with state programs, and must furnish a copy of the certification to the affected states, which may file objections with the federal agency); 15 CFR Part 930, Subpart D, especially 15 CFR § 930.54; *Viking II,* 6 I.C.C.2d at 248 n. 30. Here, the Commission's dismissal of Viking's application for common carrier authority on jurisdictional grounds meant that no licensing proceeding existed sufficient to trigger these regulations. *See Viking I,* 4 I.C.C.2d at 640 n. 9; *Exemption of Water Carrier Operations,* 4 I.C.C.2d 656 (available on WESTLAW, FTRAN–ICC database), 1988 ICC Lexis 189 (June 14, 1988) [hereinafter *Water Carriers*] (noting that "licensing" requires an "applicant" for a license); 15 CFR § 930.52 (defining "applicant" as "any individual [or corporation who] files an application for a Federal license or permit to conduct an activity affecting the coastal zone"). Thus, neither the Commission nor Viking breached any notice obligation under CZMA.

We find unpersuasive Cross–Sound's analogies to an earlier decision in which the Commission concluded that its exemption of entire classes of water carriers constituted a "federal activity" requiring a CZMA consistency determination. *See Water Carriers* (available on WESTLAW at screen 9), 1988 ICC Lexis 189, at 11. Unlike *Viking II,* in which one carrier's services were held exempt, *Water Carriers* involved a broad, traditional rulemaking proceeding in which four *classes* of carriers were exempted. *See id.* (available on WESTLAW at screens 2–8), Lexis cite at 2–10 (describing exempted classes, and

recognizing that Commission's action had "potential for directly affecting coastal zones by allowing some additional water carrier operations"). Indeed, the rulemaking fit squarely within the definition of "federal activity," and could not qualify under the less stringent licensing or permitting scheme discussed above. *See id.* (available on WESTLAW at screens 9–10), Lexis cite at 11–12 (discussing why decision constitutes a federal activity); 15 CFR § 930.31(a) (defining federal activity); 15 CFR § 930.52 (requiring "applicant" for federal license). Thus, we find Cross–Sound's reliance on *Water Carriers* inapposite.

## V.

We conclude that the Commission has not changed its policy with respect to the ferry exemption, and find that its comprehensive discussion of the exemption in *Viking II* satisfies this court's mandate in *Cross–Sound I,* as well as the more general standards for reasoned decisionmaking. We further conclude that the Commission appropriately found Viking's operations to be exempt under section 10544(a)(4), and we reject Cross–Sound's allegations of procedural error. Finally, we conclude that the Commission's finding that it lacked jurisdiction over Viking's services did not trigger environmental review responsibilities under either NEPA or CZMA. For the foregoing reasons, Cross–Sound's petition for review is denied.

*It is so ordered.*

CLARENCE THOMAS, Circuit Judge, concurring in part and concurring in the denial of the petition for review:

Although I join the majority in rejecting Cross–Sound's claims under the Interstate Commerce Act, I do not join the majority in reviewing Cross–Sound's claims under the National Environmental Policy Act (NEPA) and the Coastal Zone Management Act (CZMA). Before this court may review the merits of any of Cross–Sound's claims, we must decide whether we have the authority to do so. *See FW/PBS, Inc. v. City of*

*Dallas,* 493 U.S. 215, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984))). Having examined our own jurisdiction over Cross–Sound's environmental claims, I conclude that we have none: Cross–Sound does not have article III standing. This court thus has no power to judge the merits of Cross–Sound's claims under NEPA and CZMA.

### I.

The statute that gives this court the power to hear ICC cases limits our jurisdiction to petitions brought by a "party aggrieved." 28 U.S.C. § 2344. Cross–Sound has participated aggressively at every level in all of the proceedings in this case, and no one suggests that Cross–Sound has not achieved rank as a "party." *See Water Transp. Ass'n v. ICC,* 819 F.2d 1189, 1192–93 & n. 27 (D.C.Cir.1987). The question instead is whether, with respect to the Commission's decision that it did not bear certain obligations under NEPA and CZMA, Cross–Sound has been "aggrieved." We answer this question by "'engag[ing] in traditional standing analysis.'" *Id.* at 1193 (citation omitted). In order to establish constitutional standing, Cross–Sound must show "that it has suffered an injury in fact traceable to the Commission's ruling and redressable by a decision in [Cross–Sound's] favor." *Id.* In order to establish prudential standing, Cross–Sound must show "that the interest thereby abridged was arguably within the zone protected or regulated by the constitutional or statutory guaranty in question." *Id.*

Cross–Sound alleges that the Commission's decision has aggrieved it both as Viking's competitor and as a landowner. I acknowledge that the Commission's decision might ultimately affect Cross–Sound's fiscal health. And though the record does not reveal whether Cross–Sound owns any waterfront buildings, or bulkheads, or other littoral property, I assume that the Commission's decision will lower the value of the company's land. Cross–Sound would thus have suffered injuries-in-fact both as a competitor and as a landowner. But Cross–Sound would still not have attained article III standing. Cross–Sound would have us order the Commission to prepare an environmental impact statement under NEPA and a consistency determination under CZMA, both of which ostensibly would provide the Commission with information on the environmental consequences of its choices. Cross–Sound suggests that the Commission would do well to ponder the effects of its actions on the "'increasingly fragile'" waters of the Long Island Sound. Brief for Petitioner at 38 (citation omitted); *see also id.* at 38 n. 13 (citing *L.I. Sound Is So Polluted It Faces Long–Term Damage,* N.Y. Times, July 6, 1990, at A1). I agree that as a matter of policy, it probably should. As a matter of law, however, the Commission has no power to regulate ferries for environmental reasons. Therefore, neither of the alleged injuries could be redressed by a decision in Cross–Sound's favor on its NEPA and CZMA claims, and Cross–Sound thus has no standing to bring them.[1]

The Interstate Commerce Act deprives the Commission of jurisdiction over transportation "by a ferry," "[e]xcept to the extent the ... Commission finds it necessary to exercise jurisdiction to carry out the [national] transportation policy." 49 U.S.C. § 10544(a)(4).[2] In defining the word

---

**1.** In its claims under the Interstate Commerce Act, in contrast, Cross–Sound seeks an order requiring the Commission to regulate Viking's ferry service. That remedy, if we were to direct it, would redress the injuries-in-fact that Cross–Sound asserts. I therefore agree with the majority's implicit conclusion that Cross–Sound has standing to bring its Interstate Commerce Act claims.

**2.** Section 10544(a) provides:
Except to the extent the Interstate Commerce Commission finds it necessary to exercise jurisdiction to carry out the [national] transportation policy of section 10101 of this title, the Commission does not have jurisdiction under this subchapter over transportation by water carrier when the transportation is provided—
. . . .

"ferry," the Commission properly took into account the specific *transportation* criteria—directness of route, character and frequency of service—that "flow from the status of a ferry as a 'floating section of highway.'" *Viking Starship, Inc.*, 6 I.C. C.2d 228, 235 (1989) (common carrier application) (quoting J. Perry, *American Ferryboats* 171 (1957)) [hereinafter *Viking II*]; *see ante* at 329–331 (endorsing Commission's definition). The Commission did *not* consider *environmental* criteria in defining the word "ferry," and no one seriously contends that it could have.

Nor could the Commission have taken the environment into account at the second stage of its proceeding, when it decided whether it should regulate Viking's ferry service in order to carry out the national transportation policy. The national transportation policy comprises several separate congressional concerns, such as safety and labor conditions in the transportation industry and relations between state and federal transportation authorities. *See* 49 U.S.C. § 10101(a)(1).[3] Each is meant to further Congress's ultimate goal: "to ensure the development, coordination, and preservation of a transportation system that meets the *transportation needs* of the United States." *Id.* § 10101(a) (emphasis added).

Conspicuous in its absence from the national transportation policy is any allusion to our nation's *environmental* needs, and the Commission would be hard pressed to fit environmental concerns as such within the language of the statute. The majority suggests that the Commission might be able to squeeze the environment into Congress's charge that the Commission promote "efficient transportation." 49 U.S.C. § 10101(a)(1)(B); *see ante* at 333. This reading seems to me flawed for two reasons. First, notwithstanding the majority's advice, the Commission itself reads the national transportation policy, as I do, to exclude environmental matters—a point that the Commission made both in its opinion below and in its brief to this court. *See Viking II*, 6 I.C.C.2d at 249 n. 33 ("We doubt that we have authority to use the [national transportation policy] exception as a basis for addressing environmental issues associated with otherwise exempt ferry services, since the [policy] makes no reference to environmental issues."); Joint Brief of Respondents Interstate Commerce Commission and United States of America at 29 ("Neither section 10101 nor section 10544(a) mention [sic] environmental impacts. Thus, the Commission is to be guided by *transportation* and *economic* principles in deciding whether the regulation of ferriage is necessary. Environmental impacts play no part in determining whether certain transportation is ferry service, or whether the Commission should exercise its authority to overide [sic] the exemption in a particular case.").

Second, it is axiomatic that in construing a statute, "the court must look to the particular statutory language at issue, *as well as the language and design of the statute as a whole.*" *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) (emphasis added). The majority here plucks one word, "efficient," from a comprehensive statute that in language and design deals solely

---

(4) by a ferry.
49 U.S.C. § 10544(a).

**3.** Section 10101(a) provides:

[T]o ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, ... it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and—
(1) in regulating those modes—
(A) to recognize and preserve the inherent advantage of each mode of transportation;
(B) to promote safe, adequate, economical, and efficient transportation;
(C) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;
(D) to encourage the establishment and maintenance of reasonable rates for transportation, without unreasonable discrimination or unfair or destructive competitive practices;
(E) to cooperate with each State and the officials of each State on transportation matters; and
(F) to encourage fair wages and working conditions in the transportation industry.
49 U.S.C. § 10101(a).

with our country's *"transportation needs,"* and suggests that the word is malleable enough to cover the "environment." But the Interstate Commerce Act includes words that are far more elastic, and the Supreme Court has rejected attempts to stretch those words as thinly as the majority proposes the Commission do here. In *New York Central Securities Corp. v. United States,* 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138 (1932), for example, a unanimous Court construed a section in the Act that gives the Commission the power to regulate on behalf of the "public interest." Chief Justice Hughes wrote:

> [T]he term "public interest" as thus used [in the statute] is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred.

*Id.* at 25, 53 S.Ct. at 48; *cf. NAACP v. FPC,* 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976) (authority to promote "public interest" does not give Federal Power Commission (now FERC) warrant to try to remedy employment discrimination without regard to effects on utility rates). When Congress wants the Commission to make decisions for environmental reasons, it explicitly tells the Commission to do so. *See, e.g.,* 49 U.S.C. § 10362(c)(4) (Rail Services Planning Office must consider "the cost to the environment");[4] *cf. id.* § 10101a(15) (under national rail transportation policy, Congress intends to "encourage and promote energy conservation"). When Congress formally codified the national transportation policy, fifty-one years

ago, *see* Transportation Act of 1940, Pub.L. No. 76–785, § 1, 54 Stat. 899, 899, it surely did not mean to give the Commission license to regulate ferries in order to promote ecological consciousness-raising—or any other "externalities" unconnected to Congress's narrow focus on fields within the Commission's traditional realm of expertise, the economics of transportation.

In this case, Cross–Sound wants the Commission to prepare both an environmental impact statement, *see* 42 U.S.C. § 4332(2)(C), and a consistency determination, *see* 16 U.S.C. § 1456(c)(1); 15 C.F.R. § 930.4(a), (b), with respect to its finding first, that Viking is a ferry and second, that Viking is not subject to the Commission's control. Both environmental impact statements and consistency determinations are meant to disseminate information on the environmental consequences of government action. But as far as Cross–Sound is concerned, more information is not any better than less information, or, for that matter, than no information at all. Neither an environmental impact statement nor a consistency determination can affect the Commission's decision whether Viking is or is not a ferry, and if it is, the decision whether to regulate Viking nonetheless. In this case, the environment simply is not on the Commission's agenda.

A favorable result for Cross–Sound on its environmental claims could not redress Cross–Sound's injuries-in-fact. Cross–Sound thus has no article III standing to bring those claims, and we thus have no authority under the Constitution to hear them. *See Public Citizen v. NHTSA,* 848 F.2d 256, 262–63 & n. 27 (D.C.Cir.1988); *Natural Resources Defense Council, Inc. v. Berklund,* 609 F.2d 553, 558 (D.C.Cir. 1979) (per curiam).[5] I express no opinion

---

**4.** Section 10362(c) provides:

> [R]ail properties are suitable for rail transportation continuation subsidies if the cost of the required subsidy to the taxpayers for the properties each year is less than—
>
> .     .     .     .     .
>
> (4) *the cost to the environment* measured by damage caused by increased pollution.

49 U.S.C. § 10362(c) (emphasis added).

**5.** Since competitors are not within the zone of interests that NEPA and CZMA protect, I doubt, in addition, that Cross–Sound meets the requirements of prudential standing. *See Hazardous Waste Treatment Council v. EPA,* 861 F.2d 277, 283–84 (D.C.Cir.1988) (per curiam) ("When we grant standing to a party with only an oblique relation to the statutory goal, we run the risk that the outcome could, even assuming technical fidelity to law, in fact thwart the congres-

on the majority's discussion of the merits. With respect, though, I do offer a few words on the majority's decision to assert jurisdiction without deciding whether it has any and then to proceed to rule in this case on the merits of Cross–Sound's environmental claims.

## II.

Federal courts are courts of limited jurisdiction. When federal jurisdiction does not exist, federal judges have no authority to exercise it, even if everyone—judges, parties, members of the public—wants the dispute resolved. *See, e.g., CFTC v. Schor*, 478 U.S. 833, 850–51, 106 S.Ct. 3245, 3256–57, 92 L.Ed.2d 675 (1986); *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 & n. 4, 106 S.Ct. 1326, 1331 & n. 4, 89 L.Ed.2d 501 (1986); *Sosna v. Iowa*, 419 U.S. 393, 398, 95 S.Ct. 553, 556, 42 L.Ed.2d 532 (1975); *American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 17–18 & n. 17, 71 S.Ct. 534, 541–42 & n. 17, 95 L.Ed. 702 & n. 17 (1951); *Anglo Am. Provision Co. v. Davis Provision Co. No. 2*, 191 U.S. 376, 377, 24 S.Ct. 93, 94, 48 L.Ed. 228 (1903) (Holmes, J.); *Mansfield, Coldwater & Lake Mich. Ry. v. Swan*, 111 U.S. 379, 382–84, 4 S.Ct. 510, 511–13, 28 L.Ed. 462 (1884); *People's Bank v. Calhoun*, 102 U.S. 256, 260–61, 26 L.Ed. 101 (1881); *Cutler v. Rae*, 48 U.S. (7 How.) 765, 767, 12 L.Ed. 890 (1849); *Jackson v. Ashton*, 33 U.S. (8 Pet.) 93, 94, 8 L.Ed. 898 (1834) (Marshall, C.J.); *Capron v. Van Noorden*, 6 U.S. (2 Cranch) 71, 72, 2 L.Ed. 229 (1804). It follows that federal courts have a " 'special obligation' " to appraise at the outset their own jurisdiction, even when the parties, or the lower courts, have not raised any jurisdictional questions themselves. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) (citation omitted). This tenet is as solid as bedrock and almost as

old. *See, e.g., Duquesne Light Co. v. Barasch*, 488 U.S. 299, 306, 109 S.Ct. 609, 614, 102 L.Ed.2d 646 (1989); *Bender*, 475 U.S. at 541 & n. 4, 106 S.Ct. at 1331 & n. 4; *Juidice v. Vail*, 430 U.S. 327, 331–32, 97 S.Ct. 1211, 1215–16, 51 L.Ed.2d 376 (1977); *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 740, 96 S.Ct. 1202, 1204, 47 L.Ed.2d 435 (1976); *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 588, 59 S.Ct. 744, 748, 83 L.Ed. 1001 (1939); *United States v. Corrick*, 298 U.S. 435, 440, 56 S.Ct. 829, 831, 80 L.Ed. 1263 (1936); *Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934) (Brandeis, J.); *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908); *Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453–54 & n. 1, 20 S.Ct. 690, 691–92 & n. 1, 44 L.Ed. 842 (1900); *Mansfield*, 111 U.S. at 382–84, 4 S.Ct. at 511–13; *Jackson*, 33 U.S. (8 Pet.) at 94; *Capron*, 6 U.S. (2 Cranch) at 72; *see also, e.g., Citizens for the Abatement of Aircraft Noise, Inc. v. Metropolitan Washington Airports Auth.*, 917 F.2d 48, 53 (D.C.Cir.1990) ("As a threshold matter, we must consider whether this case is justiciable. Although the [defendant] has not pressed the issue on appeal, it is well established that a court of appeals must first satisfy itself of its own jurisdiction, *sua sponte* if necessary, before proceeding to the merits."), *cert. granted on other grounds*, —— U.S. ——, 111 S.Ct. 750, 112 L.Ed.2d 770 (1991); *Rubins Contractors, Inc. v. Lumbermens Mut. Ins. Co.*, 821 F.2d 671, 673 (D.C.Cir. 1987) ("Before addressing the merits of this dispute we must find jurisdiction to do so.... Although [the defendant] sought to waive the issue at oral argument, we have an independent obligation to determine whether jurisdiction was proper."); *Reynolds v. Sheet Metal Workers, Local 102*, 702 F.2d 221, 223 (D.C.Cir.1981) ("Fed-

---

sional goal. Further, of course, technical fidelity to law cannot be assumed; judges err."), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989); *cf. Churchill Truck Lines, Inc. v. United States*, 533 F.2d 411, 416 (8th Cir.1976) (footnote and citations omitted):

Petitioners, whose sole motivation ... was their own economic self-interest and welfare, are singularly inappropriate parties to be en-

trusted with the responsibility of asserting the public's environmental interest in proceedings concerning the issuance of operating authority to motor carriers.... [NEPA] was not designed to prevent loss of profits but was intended to promote governmental awareness of and action concerning environmental problems.

eral courts are courts of limited jurisdiction, and are obliged always to ascertain whether they have subject matter jurisdiction over the litigation before them, even when the parties prefer to ignore the question.").

The truistic constraint on the federal judicial power, then, is this: A federal court may not decide cases when it cannot decide cases, and must determine whether it can, before it may. The majority here changes this fundamental precept to read, in effect, that under certain circumstances a federal court should decide cases regardless of whether it can, and need not determine whether it can, before it does. This revision seems to me difficult to square with the Supreme Court's regular warnings to the federal courts to fulfill their "special obligation" to inquire into their own jurisdiction at the outset. Originally stated in 1804, in *Capron v. Van Noorden,* 6 U.S. (2 Cranch) at 72, the rule was articulated most forcefully in *Mansfield, Coldwater & Lake Michigan Railway v. Swan,* 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884). In *Mansfield,* a unanimous Court explained that this rule, "springing from the nature and limits of the judicial power of the United States, is inflexible and without exception." *Id.* at 382, 4 S.Ct. at 511.

> [T]he rule ... requires this court, of its own motion, to deny its own jurisdiction, and, in the exercise of its appellate power, that of all the other courts of the United States, in all cases where such jurisdiction does not affirmatively appear in the record on which, in the exercise of that power, it is called to act. ... [T]he first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it.

*Id.*

The Supreme Court reiterated this principle twice last Term. In reviewing the respondents' citizenship in *Carden v. Arkoma Associates,* 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990), the Court held that "[s]ince diversity of citizenship is a jurisdictional requirement, the Court is always 'called upon to decide' it." *Id.,* 110 S.Ct. at 1021; *see id.* (" '[T]he failure of parties to urge objections [to diversity of citizenship] cannot relieve this court from the duty of ascertaining from the record whether the Circuit Court could properly take jurisdiction of this suit.' " (quoting *Great Southern Fire Proof Hotel,* 177 U.S. at 453, 20 S.Ct. at 691)). In *FW/PBS,* the Court ordered dismissal of a claim for lack of article III standing, even though neither the parties nor the lower courts had addressed the issue. The Court stressed that "[t]he federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of the [jurisdictional] doctrines.' " 110 S.Ct. at 607 (citation omitted).

> "[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it. *Mitchell v. Maurer,* 293 U.S. 237, 244 [55 S.Ct. 162, 165, 79 L.Ed. 338] (1934). *See Juidice v. Vail,* 430 U.S. 327, 331–32 [97 S.Ct. 1211, 1215, 51 L.Ed.2d 376] (1977) (standing). 'And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it.' [*United States v. Corrick,* 298 U.S. 435, 440 [56 S.Ct. 829, 831, 80 L.Ed. 1263] (1936).]"

*Id.* (quoting *Bender,* 475 U.S. at 541, 106 S.Ct. at 1331).

To require that a court resolve jurisdictional questions before addressing non-jurisdictional ones raises the difficult question of how to distinguish the two. The rule of *Mansfield* might be reduced to tautology if jurisdiction were *defined* to encompass grounds that the court, on its own motion if necessary, must establish at the threshold. The term "jurisdiction," however— "an all-purpose word denoting adjudicatory power"—bears different meanings in different contexts. *Szabo Food Serv., Inc. v. Canteen Corp.,* 823 F.2d 1073, 1077 (7th

Cir.1987), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988). Sometimes, for example, characterizing a provision as "jurisdictional" implies that a court cannot temper the application of the provision through otherwise available equitable doctrines such as waiver, tolling, and estoppel. *See, e.g., Irwin v. Veterans Admin.,* —— U.S. ——, 111 S.Ct. 453, 455–58, 112 L.Ed.2d 435 (1990). Other times, characterizing a provision as bearing on an inferior tribunal's "jurisdiction" might signify that on appeal, that tribunal's interpretation of the provision is not entitled to deference. *See, e.g., Mississippi Power & Light Co. v. Mississippi ex rel. Moore,* 487 U.S. 354, 386–89, 108 S.Ct. 2428, 2446–48, 101 L.Ed.2d 322 (1988) (Brennan, J., dissenting).

Given the woolliness of the concept, it is hardly surprising that there exists a significant gray area between grounds of decision that clearly are jurisdictional and grounds that clearly are not. In a sense, *all* applicable rules limit the authority of the relevant adjudicative tribunal; for this reason, proponents of deferring to reasonable agency interpretations of even "jurisdictional" provisions have argued that deference is necessary because *no* intelligible distinction can be drawn between jurisdictional and non-jurisdictional provisions of statutes entrusted for their administration to the agency. *See Mississippi Power,* 487 U.S. at 380–82, 108 S.Ct. at 2443–44 (Scalia, J., concurring in the judgment). In contexts where distinctions between jurisdictional and non-jurisdictional provisions are made routinely, the distinctions can prove elusive. *Compare, e.g., Irwin,* 111 S.Ct. at 457 (deeming a provision that "an employee ... may file a civil action" within a certain time to be non-jurisdictional for tolling purposes) *with, e.g., Soriano v. United States,* 352 U.S. 270, 273–77, 77 S.Ct. 269, 271–74, 1 L.Ed.2d 306 (1957) (deeming a provision that "[e]very claim ... shall be barred unless ... filed" within a certain time to be jurisdictional for tolling purposes). To complicate matters further, some provisions—the eleventh amendment, for example—can be jurisdictional in some contexts, and non-jurisdictional in others. *Compare*

*Patsy v. Board of Regents,* 457 U.S. 496, 516 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982) (stating that the eleventh amendment is not "jurisdictional in the sense that it must be raised and decided by this Court on its own motion") *with Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974) ("[T]he Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court."). Finally, and most importantly for present purposes, it is well-settled that at some point a claim becomes sufficiently frivolous *on the merits* as to justify a dismissal for lack of *jurisdiction. See, e.g., Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) (dismissal from district court when the claim is "wholly insubstantial and frivolous"); *Zucht v. King,* 260 U.S. 174, 176–77, 43 S.Ct. 24, 25, 67 L.Ed. 194 (1922) (dismissal from Supreme Court when the claim is not "sufficiently substantial").

The *Mansfield* rule is violated only if the ground passed over is jurisdictional and the ground rested upon is non-jurisdictional, for courts properly rest on one jurisdictional ground instead of another, or on one merits ground instead of another. In cases where either ground is difficult to characterize, it is difficult to determine whether the rule has been violated. Arguably, moreover, the rule might not apply at all if the ground passed over sufficiently, though not entirely, "partakes of the nature" of a merits ground, or if the ground rested upon "sufficiently," though not entirely, "partakes of the nature of a jurisdictional bar," *Jordan,* 415 U.S. at 678, 94 S.Ct. at 1363. Here, however, the ground passed over—whether there exists a case or controversy within the meaning of article III—is unambiguously jurisdictional, *see, e.g., Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984), and the ground rested upon— whether the Commission took "major Federal actions" or engaged in "Federal activity" sufficient to trigger duties under NEPA or CZMA—is unambiguously non-jurisdictional. In this situation, no Su-

preme Court case authorizes the breach of the *Mansfield* rule that the majority today commits.[6]

Between 1969 and 1976, the Supreme Court decided four cases that are sometimes cited in support of assuming jurisdiction *arguendo* and rendering a judgment on the merits: *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); *Chandler v. Judicial Council*, 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970); *Secretary of the Navy v. Avrech*, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974) (per curiam); and *Norton v. Mathews*, 427 U.S. 524, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976). In *Augenblick*, however, the ground passed over was at least arguably non-jurisdictional, and in *Chandler, Avrech*, and *Norton*, the ground rested upon was at least arguably jurisdictional. Upon close examination, therefore, none of these cases authorizes the practice undertaken by the majority.

*Augenblick* involved actions for back pay brought in the Court of Claims by soldiers challenging the constitutionality of their prior court-martial convictions. *See* 393 U.S. at 348–49, 89 S.Ct. at 528–29. The Court of Claims had "jurisdiction to render judgment against the United States on any claim 'founded ... upon the Constitution.'" *Id.* at 349 n. 2, 89 S.Ct. at 530 n. 2 (quoting 28 U.S.C. § 1491). Thus, one issue in *Augenblick* was whether the soldiers were barred from recovery in the Court of Claims by the preclusive effect of their convictions in the courts-martial. The Su-

preme Court declined to address this issue: "[A]ssum[ing], *arguendo*, that a collateral attack on a court-martial judgment" could be made, the Court held that the attacks before it were without merit. *See id.* at 351–52, 89 S.Ct. at 531–32.

A defense of claim or issue preclusion, which can be waived if not properly preserved, is almost always considered non-jurisdictional. *See, e.g.,* Fed.R.Civ.P. 8(c) (requiring res judicata to be pleaded as an affirmative defense); *Poulin v. Bowen*, 817 F.2d 865, 869 & n. 37 (D.C.Cir.1987) ("Failure to so plead constitutes a waiver of the defense."); *see also* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1278, at 481–82 & n. 9 (2d ed. 1990). Although the argument for preclusion in *Augenblick* was statutory, the statute on which it was based gives little hint of a more jurisdictional flavor than the common-law doctrine that the statute codifies. *See* 10 U.S.C. § 876 (providing that military review of court-martial convictions shall be "final and conclusive" and "binding upon all ... courts ... of the United States"). To the extent that *Augenblick* bypassed a preclusion defense to reject the claims against which that defense was asserted, it simply rested on one merits ground as opposed to another, and provides no basis for dodging jurisdiction to reach the merits.[7]

Despite the general rule that questions of claim or issue preclusion are non-jurisdictional, they are at least jurisdiction-like in two senses: first, they can usually be

6. The policies of avoiding constitutional questions for non-constitutional ones, *see, e.g., Ashwander v. TVA*, 297 U.S. 288, 345–48, 56 S.Ct. 466, 482–84, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), apply with equal force to jurisdictional determinations. In this case, however, the constitutional questions go to jurisdiction and the non-constitutional ones go to the merits, and the prudential concerns of *Ashwander* cannot override a rule that is "inflexible and without exception," *Mansfield*, 111 U.S. at 382, 4 S.Ct. at 511. Thus, in *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), the Court raised and decided a question of *constitutional* standing, *see id.* at 331–33, 97 S.Ct. at 1215–16, before holding that the district court erred in not abstaining under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) —a *non-constitutional* ground of decision gener-

ally treated as non-jurisdictional, *see, e.g., Ohio Bureau of Employment Servs. v. Hodory*, 431 U.S. 471, 480, 97 S.Ct. 1898, 1904, 52 L.Ed.2d 513 (1977) (permitting states to waive a *Younger* defense); *Ellis v. Dyson*, 421 U.S. 426, 435, 95 S.Ct. 1691, 1696, 44 L.Ed.2d 274 (1975) (instructing district court to decide on remand article III issues before reaching *Younger* issues).

7. *Norton* bypassed the question whether a statute prohibited collateral attack in the district court upon an administrative adjudication by the Secretary of Health, Education, and Welfare. The Court correctly characterized that question as jurisdictional, because the preclusion statute at issue in *Norton* was written in expressly jurisdictional terms. *See* 42 U.S.C. § 405(h), *quoted in* 427 U.S. at 529 n. 5, 96 S.Ct. at 2774 n. 5.

determined as a matter of law at the outset, simply by examining the face of the new pleadings in light of the prior proceeding; second, because they touch upon the comity owed by one tribunal to the judgments and orders of another, they implicate institutional concerns that go beyond the rights of individual litigants. It is not surprising, therefore, that the Supreme Court occasionally has cast preclusion questions in expressly jurisdictional terms. *See District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). In those cases, which involved the preclusive effect of state-court judgments in subsequent federal-court litigation, the Supreme Court reasoned that if a district court issues a judgment on a matter "inextricably intertwined" with a state-court judgment, then "the district court is in essence ... review[ing] the state-court decision," 460 U.S. at 483–84 n. 16, 103 S.Ct. at 1315–16 n. 16—"an exercise of appellate jurisdiction" unauthorized by statute, 263 U.S. at 416, 44 S.Ct. at 150.

Jurisdictional recasting of preclusion questions has occurred only rarely. The general rule remains that preclusion questions are non-jurisdictional. Thus, when determining the preclusive effect to which state-court judgments are entitled, the Court usually eschews the theory of *Rooker–Feldman* for the more conventional approach of simply applying the substantive preclusion law of the state, *see* 28 U.S.C. § 1738, on the merits. *See, e.g., Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). *See generally* P. Bator, D. Meltzer, P. Mishkin & D. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 1615–34 (3d ed. 1988).

In *Augenblick,* the Court at times spoke in terms reminiscent of *Rooker* and anticipating *Feldman.* Instead of consistently framing the issue in terms of whether "a *collateral* attack on a court-martial judgment" was appropriate, 393 U.S. at 351, 89 S.Ct. at 531 (emphasis added), it also questioned the "jurisdiction" of the Court of Claims to "review" court-martial convictions, *id.* at 349, 89 S.Ct. at 529. In *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), however, another case involving the preclusive effect of a court-martial judgment, the Court returned to the more traditional, non-jurisdictional idiom. *Councilman* held that 10 U.S.C. § 876, the same preclusion statute at issue in *Augenblick,* merely "defines the point at which military court judgments become final and requires that they be given res judicata effect." *Id.* at 749, 95 S.Ct. at 1309. The Court expressly rejected the argument that section 876 divests the district courts of *original* jurisdiction to entertain *collateral* attacks on court-martial judgments, *see id.* at 748–53, 95 S.Ct. at 1308–311, and it at least implicitly rejected the alternative jurisdictional theory that any district court so doing would effectively be engaging in *direct* review without a statutory grant of *appellate* jurisdiction. *See id.* at 753, 95 S.Ct. at 1311 ("[T]he district court had subject-matter jurisdiction....").

In light of this background, *Augenblick* cannot plausibly be read as authorizing courts to sidestep jurisdiction. Interpreted that broadly, *Augenblick* would stand without precedent or progeny, breaching an otherwise intact phalanx of Supreme Court authority spanning almost two centuries while "offer[ing] not a single word of analysis or justification" for so doing. Comment, *Assuming Jurisdiction Arguendo: The Rationale and Limits of Hypothetical Jurisdiction,* 127 U.Pa.L. Rev. 712, 713 (1979). To save *Augenblick* from that dubious distinction, one need only posit that the Court, despite occasional rhetoric to the contrary, viewed the preclusion question in customary, non-jurisdictional terms, presaging its later, express holding in *Councilman.*[8]

---

8. *Avrech* probably can. be explained in terms similar to *Augenblick.* In *Avrech,* the court by-

The other Supreme Court cases passed over grounds that are clearly jurisdictional, but rested on alternative grounds that are at least arguably jurisdictional. Thus, in *Chandler*, the Supreme Court avoided deciding whether it had jurisdiction to issue writs of prohibition or mandamus against the judicial council of the Tenth Circuit, holding instead that the petitioner was not entitled to so extraordinary a remedy because he had failed to exhaust the other avenues of relief available to him. *See* 398 U.S. at 86–89, 90 S.Ct. at 1654–56; *see also Coalition for the Preservation of Hispanic Broadcasting v. FCC*, 931 F.2d 73, 75–79 (D.C.Cir.1991) (en banc) (avoiding standing question and dismissing petitioners' claim for failure to exhaust administrative remedies); *Champagne v. Schlesinger*, 506 F.2d 979, 982 (7th Cir.1974) ("[E]xhaustion is a quasi-jurisdictional problem...").

Similarly, in *Avrech* and *Norton*, the Court rested on essentially jurisdictional grounds—"[t]he inability of the federal judiciary 'to review moot cases,'" *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974) (per curiam) (citation omitted). On the merits, *Avrech* and *Norton* involved constitutional challenges to, respectively, a court-martial conviction and an administrative adjudication denying entitlement to certain benefits. In addition, each case presented a threshold question, cast in jurisdictional terms,[9] whether the prior judgment could be collaterally attacked in the district court. While *Avrech* was pending, the Supreme Court decided another case presenting the identical merits issue, rejecting the position advocated by the plaintiff in *Avrech*. The same thing happened in *Norton*. In both cases, the Court refused to decide the pending

jurisdictional question, but issued a conforming merits decision nonetheless.

In *Avrech*, the Court decided that the intervening decision had rendered the merits question so insubstantial that it effectively prevented the Court from receiving the requisite adversary presentation on the threshold, jurisdictional question. Faithful to the *Mansfield* rule, the Court had ordered supplemental briefing on the jurisdictional question, but had yet to hear oral argument on it. The Court reasoned that deciding the jurisdictional question would be inappropriate under the circumstances, because "even the most diligent and zealous advocate could find his ardor somewhat dampened in arguing a jurisdictional issue where the decision on the merits is thus foreordained." 418 U.S. at 678, 94 S.Ct. at 3040.[10]

*Norton* involved a similar situation, except that the jurisdictional question had been fully briefed and argued before the intervening decision was handed down. Nonetheless, the Court made clear that the effect of the intervening decision was to render the merits issues so "insubstantial" as "not even to support the *jurisdiction* of a three-judge district court to consider [them] on remand." 427 U.S. at 531, 96 S.Ct. at 2775 (emphasis added); *see id.* at 530–31, 96 S.Ct. at 2774–75 ("Th[e] disposition [in the intervening case] renders the merits in the present case a decided issue" —foreordained—"and thus no longer substantial in the jurisdictional sense.").

Given the mooting effect of the intervening decision in both *Avrech* and *Norton*, a more fastidious Court might have either dismissed the appeals or vacated the lower

---

passed the question, which it cast in jurisdictional terms, whether a district-court plaintiff seeking back pay could collaterally attack a court-martial conviction. *See* 418 U.S. at 676–77, 94 S.Ct. at 3039–40. The Court's characterization of the bypassed preclusion question as jurisdictional was perhaps more plausible in *Avrech* than in *Augenblick*, however, for the plaintiff in *Avrech* (like the plaintiffs in *Rooker* and *Feldman*, but unlike the plaintiffs in *Augenblick*) sought an actual declaration that another tribunal's judgment was invalid. *See id.* at 677, 94 S.Ct. at 3039. But since *Avrech* rested on

jurisdictional grounds in any event, *see infra* pp. 344–345, it matters little whether the bypassed preclusion question there is considered jurisdictional or not.

**9.** *See supra* notes 7, 8.

**10.** Since the jurisdictional issue was under consideration only because the Court raised it on its own initiative after hearing oral argument on the merits, it is especially ironic that *Avrech* has come to be cited in support of sidestepping jurisdiction altogether.

court judgments and remanded with instructions to dismiss, alternative dispositions that would have left the pending jurisdictional questions undecided by the Court. *Cf. United States v. Munsingwear,* 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950) (generally endorsing the latter course when a civil case becomes moot pending appeal). Instead, without deciding the jurisdictional questions, the Court reversed on the merits in *Avrech* and affirmed on the merits in *Norton,* reasoning that "whichever disposition we undertake, the effect is the same." 427 U.S. at 532, 96 S.Ct. at 2775. Notwithstanding the Court's merits *dispositions,* it is clear from the supporting *reasoning* that *Avrech* and *Norton* permit this approach only when an intervening decision renders a pending claim so "foreordained" or "insubstantial" that under cases like *Bell v. Hood* or *Zucht v. King,* the claim would not even have supported federal *jurisdiction* had the intervening decision been decided beforehand. The majority might well be correct that the environmental questions in this case are easier to resolve than are the standing questions, but the majority's answer is hardly so "foreordained" as to make the claims insubstantial in a jurisdictional sense.

In sum, not a single Supreme Court case authorizes federal courts to shuffle around unambiguously jurisdictional problems in order to issue judgments unambiguously on the merits. As one defender of this approach candidly admits, "there is ... no Supreme Court opinion unequivocally holding that it is permissible to assume justiciability and rule on the substantive merits." Comment, *supra,* 127 U.Pa.L.Rev. at 745.

I recognize, of course, that the majority's approach finds support in the precedents of

this court decided after *Augenblick. See, e.g., Adams v. Vance,* 570 F.2d 950, 953–55 & n. 7 (D.C.Cir.1978); *Chinese Am. Civic Council v. Attorney Gen.,* 566 F.2d 321, 325–26 & n. 9 (D.C.Cir.1977). Given only those decisions, I would of course be bound to accept this court's judgment that cases such as *Augenblick* implicitly overruled cases such as *Capron* and *Mansfield* and a host of others.[11] But if such venerable precedent can be implicitly overruled "with not a single word of analysis or justification," Comment, *supra,* 127 U.Pa.L.Rev. at 713, it can also be revivified through express reaffirmation—as happened twice last Term. However valid this circuit's cases once might have been, in my view they do not survive the Supreme Court's most recent pronouncements in *FW/PBS* and *Carden.* Since *FW/PBS* and *Carden* were decided, the only precedent from this court even arguably bypassing jurisdiction is *Coker v. Sullivan,* 902 F.2d 84 (D.C.Cir. 1990). In *Coker,* we assumed article III standing *arguendo,* resting instead on the ground that the challenge to the agency's enforcement decision was unreviewable under *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). *See Coker,* 902 F.2d at 90. *Coker* provides at best weak support for the majority's approach, however; there, we explained that "the alternative rationale on which we rely is also a *jurisdictional limitation." Id.* at 88 (emphasis added); *see also Hispanic Broadcasting,* at 76 (citing *Coker* as having "dismiss[ed] case on non-constitutional jurisdictional grounds to avoid problematic Article III inquiry").

Read in light of one hundred and eighty-seven years of other precedents, the Supreme Court's opinions in *FW/PBS* and *Carden* confirm that federal courts must

---

**11.** That concession, of course, would still not oblige me to endorse the majority's approach in this case:

> Our colleague—apparently of the view that the standing issue is too difficult to resolve—believes we should pass on to the merits without deciding whether we have the constitutional authority to hear the case. To be sure, this court has on occasion followed that course, although not often in recent times, but we are unaware of any case where a panel

was criticized for *not* employing that technique; in other words, for assuming its constitutional obligation. Here the parties have briefed the standing issue and we have done our best to answer the jurisdictional question raised. It is hard to understand why, under these circumstances, it could be thought a judicial virtue not to do so.

*United Transp. Union v. ICC,* 891 F.2d 908, 911 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990).

first assure themselves that they have the authority to hear a dispute before they may decide the dispute on the merits. *See FW/PBS,* 110 S.Ct. at 607–08; *Carden,* 110 S.Ct. at 1021. Federal courts simply may not assume jurisdiction hypothetically. Some cases might cry out for decision on the merits; some might pose difficult jurisdictional problems. Our threshold duty to examine our own jurisdiction is no less obligatory in either instance.

### III.

"If there were no jurisdiction, there was no power to do anything but strike the case from the docket. In that view of the subject the matter was as much *coram non judice* as anything else could be...." *The Mayor v. Cooper,* 73 U.S. (6 Wall.) 247, 250, 18 L.Ed. 851 (1868). In my view, this court has no jurisdiction to hear Cross-Sound's environmental claims. I would therefore strike those claims from the docket and stop before reaching the merits. Because the majority here goes further, I respectfully decline to join parts IV and V of the majority's opinion and join only parts I, II, and III.